ORA MARIE VOLK, Respondent, *v.* THE CITY OF NEW YORK, Appellant.

First Department, April 5, 1940.

REVSD 284 NY 279

*James Hall Prothero* of counsel [*Paxton Blair* and *William F. Miller* with him on the brief; *William C. Chanler, Corporation Counsel*], for the appellant.

*Jacquin Frank* of counsel [*Myron Wisoff* with him on the brief; *Herman D. Mines*, attorney], for the respondent.

DORE, J.   Plaintiff, a registered nurse employed in Bellevue Hospital in the city of New York, sues defendant as owner and operator of the hospital for defendant's alleged negligence in having available for use in the nurses' infirmary at the hospital a decomposed and deteriorated solution of morphine which, plaintiff claims, when injected by other nurses into plaintiff's left arm, caused an infection as a result of which her arm is permanently useless.

The complaint alleges that in January, 1932, plaintiff made a contract with Bellevue Hospital to enter the hospital's employ at a salary of ninety dollars a month with board, maintenance and proper medical and surgical attention, in return for which she was to follow her occupation as a nurse in the hospital.  Plaintiff testified that early in the morning of August 22, 1933, while on night duty as such nurse, after eating at or about midnight she became ill and thereafter about four o'clock in the morning suffered vomiting and nausea.   On the evening of the next day, August 23, 1933, she was sent to the nurses' infirmary at Bellevue and was

attended by one of the physicians who prescribed hypodermic injections of a morphine solution called " magendie " for the purpose of stopping the vomiting. Between August 23 and August 25, 1933, plaintiff was given four injections of magendie in the upper portion of her left arm, each injection being the usual seven minims dose, administered with a hypodermic syringe by various nurses in charge who were on duty at the time in the nurses' infirmary. During the first three injections plaintiff testified she was so ill she did not notice what was going on, but when the fourth injection was being given she was feeling better and noticed as the nurse plunged the hypodermic into her arm that the solution was a brownish colored liquid. Upon looking at the magendie bottle from which the solution had been drawn, plaintiff said she observed it was the same bottle of magendie that had been in the nurses' infirmary since February 18, 1933. She testified that morphine is locked in a separate drawer in the infirmary and the nurse in charge has the key; that she had seen that same bottle in the nurses' infirmary in February when she was the nurse in charge therein; that it was still in the infirmary when she was again in charge in June; and that it was the custom in Bellevue and other public hospitals to change magendie bottles every week.

Plaintiff testified that about a day after the last hypodermic was given her arm became sore, there were red spots on it, and it was badly swollen and painful where the four injections were given. She remained in the infirmary a week and then went to her room, where wet dressings were applied. After Labor Day that year she returned to duty for a half-day, but her arm pained so badly she was relieved from duty by one of the doctors, was readmitted to the nurses' infirmary, where she remained a week, and one of the swellings was lanced and discharged green pus. Thereafter she went back to light duty for thirteen days with her arm in a sling. Then another doctor at Bellevue lanced the three remaining swellings, which exuded thick, greenish pus. At that time she said her left hand began to swell. She was admitted to the Bellevue General Hospital on October 10, 1933, where X-rays were taken and an operation ordered by Dr. Arthur Wright, chief surgeon of the hospital. Except for the fact that the operation was under a general anæsthetic as well as an injection of morphine, the record does not indicate anything whatever about the nature or extent of the operation, performed by a Dr. Barbera of Bellevue, or what condition was found. Three days after the operation she went to her room. On cross-examination she stated that Dr. Wright, after the operation, said she was able to go back on duty, but she testified her arm was still painful, she did not see how she could work, and she resigned as a nurse in the hospital on December 15, 1933.

Harry Taub, assistant professor of the School of Pharmacy, Columbia University, a teacher who had never been employed in a hospital, testified that magendie was an aqueous solution of morphine sulphate susceptible to decomposition in three or four days normally, though it may last a week; that when freshly prepared it is a colorless solution but when stale it first turns a pale, yellowish-brown, and as decomposition increases becomes a very dark brown and is no longer a solution of chemical morphine sulphate but bacteria or micro-organisms are present. The specific nature of the bacteria was not indicated.

Herman C. Russell, formerly an adjunct assistant surgeon in Bellevue from 1919 to 1929, called by plaintiff, testified that he examined plaintiff in December, 1933, and found she had four recent scars on her arm; that the fingers of the left hand are useless, she has no power at all in the left arm or the left hand, and the condition is permanent. In answer to a hypothetical question, which assumed that, at the sites where the scars were, four injections of magendie had been given, that shortly thereafter abscesses grew and were lanced and greenish pus exuded, and that thereafter plaintiff was " operated " on at Bellevue Hospital, Dr. Russell stated that the infection arising from the injection was a competent producing cause of plaintiff's present condition and injury. He did not testify to the decomposition of the magendie and the hypothetical question did not even assume the magendie injected was discolored or decomposed.

On cross-examination Dr. Russell stated he suggested to plaintiff that X-rays be taken and that she see a neurologist; that there are objective tests showing whether the muscles or nerves were dead or not, but he did not make any such tests; that, except for the four scars and a slight swelling on the back of the left hand, there were no objective symptoms; that as to the mobility of the hand and the arm the symptoms were subjective and he tested mobility by requesting the patient to move the hand or the arm.

Plaintiff's original notice of claim had stated her condition was caused by the breaking of a hypodermic needle in her arm, by surgical operations on her arm that were improperly and negligently delayed and improperly performed, and by improper diagnosis and treatment. All of these claims were abandoned in the amended complaint and on the trial, but on cross-examination plaintiff admitted X-rays showed there was a needle in her arm and that Dr. Erdmann had offered to remove it.

At the close of the plaintiff's evidence defendant moved to amend its answer by setting up the defense that defendant, as a self-insurer, had provided workmen's compensation for employees in the hos-

pital injured in the course of their employment, including nurses, and that plaintiff's only remedy was through the Workmen's Compensation Law. As the action had been commenced in August, 1934, and the case was tried in April, 1939, the court denied the motion to amend because of defendant's claimed laches in setting up the defense, plaintiff having been at the time of the trial barred by the two-year Statute of Limitations to claim compensation under the Workmen's Compensation Law (§ 28).

Defendant rested at the close of plaintiff's case, offered no proof whatever, and moved to dismiss on the grounds that no actionable negligence was established and plaintiff failed to show she was free from contributory negligence; that in conducting Bellevue Hospital defendant was engaged in the performance of a governmental function and could not be held liable for the negligence of nurses or doctors associated with the hospital; and that on plaintiff's own testimony the negligence established was the negligence of the nurses who gave the injections for which the defendant is not responsible. Defendant also moved for direction of the verdict. The court reserved decision on all motions and charged the jury that plaintiff's claim was that defendant had negligently kept available in the nurses' infirmary a medicine that had become dangerous because of decomposition, and that plaintiff must succeed or fail entirely on that theory. The jury brought in an eleven to one verdict in the sum of $20,000 in plaintiff's favor, one juror dissenting, but only as to the amount, the verdict being unanimous as to defendant's liability. Thereafter the court denied all of the defendant's motions.

Plaintiff contends that the proximate cause of the injuries was an administrative act of the hospital in furnishing or keeping available for use the stale magendie no matter who was delegated to perform the duty of removing it when it became stale; that a supervising nurse who acted in an administrative capacity knew about the stale magendie in February, 1933, and, in failing to remove it in spite of such knowledge and leaving it available for subsequent use, she acted strictly in a ministerial and administrative capacity as an employee of the owner of the hospital; that such negligence continued as long as the bottle was left available for use; and that, assuming the nurses who made the injections were also guilty of negligence, their negligence in administering the injections concurred with the hospital's administrative negligence in making the solution available, and plaintiff can sue either or both joint tort feasors.

As indicated by the recital of the facts, plaintiff's medical proof was very sketchy. The nature of the operation performed upon her arm, its extent and the conditions found were not mentioned.

Proper proof permitting admission of the X-rays concededly taken was not offered. Not one of the numerous physicians who treated her in Bellevue Hospital was called. None of the doctors nor the neurologist plaintiff consulted outside of Bellevue was called except Dr. Russell. He did not give any medical diagnosis as such of plaintiff's injury or her present condition. When asked by plaintiff's counsel if her arm was "paralyzed and useless," he answered "It is useless," avoiding thereby even by inference a diagnosis of the pathological cause. There was neither medical diagnosis nor prognosis with regard to the pathological cause of the injury except for the conclusion that the condition of being "useless" was permanent. Plaintiff's testimony that three of her fellow nurses on four separate occasions while she was ill in the nurses' infirmary gave her injections of a drug that was on mere observation by a trained nurse obviously decomposed and dangerously stale, places a strain on one's credulity. Factors in the case raise questions as to the real nature and the cause of plaintiff's injury and her present condition. However, the jury accepted plaintiff's story, defendant offered no proof, and, accordingly, we must give every fair inference to the facts as testified to in plaintiff's case and accepted by the jury.

Section 3 of the Workmen's Compensation Law expressly provides (subd. 1, Hazardous employments, group 15) that compensation shall be payable for injuries incurred by employees employed as nurses in a hospital maintained by a municipal corporation. The complaint alleges that plaintiff made a contract with Bellevue Hospital to enter its employ at a salary of ninety dollars per month "with board and maintenance and proper medical and surgical attention, in return for which the plaintiff was to follow her occupation as a nurse in said hospital;" that "while the plaintiff was in the employ of the defendant she became ill, as a result of which she needed medical care and attention;" that defendant, through its employees, administered the four injections which caused her injuries; and that defendant itself was negligent in furnishing improper medicines, as a result of which plaintiff was injured. Clearly the complaint alleges that plaintiff was an employee in an employment enumerated in the Workmen's Compensation Law for which a remedy is afforded by law, and also alleges the cause of action arose in the course of such employment. We think it also sufficiently indicates that the cause of action arose "out of" the employment. Subdivision 7 of section 2 of the act defines injury to mean "only accidental injuries arising out of and in the course of employment and such disease or infection as may naturally and unavoidably result therefrom."

The nurses' infirmary was used for the treatment of nurses employed by the hospital. Only because plaintiff was an employee to whom (as part of its duty under the terms of the employment contract) defendant owed the duty to provide "proper medical * * * attention" did plaintiff receive the medication complained of in the nurses' infirmary. Accordingly, the complaint sufficiently alleges, and beyond question plaintiff's proofs established, that the cause of action arose "out of and in the course of employment." In such case it is well settled that no action can be maintained unless it is alleged the employer failed to comply with the statute with respect to compensation insurance; and where the statute gives a remedy it is exclusive, provided the employer has complied therewith. (*Culhane* v. *Economical Garage, Inc.*, 195 App. Div. 108, 110; *Morris* v. *Muldoon*, 190 id. 689, 691; *Matter of Heitz* v. *Ruppert*, 218 N. Y. 148.) In *Morris* v. *Muldoon* (*supra*) this court said: "In a case which would come within the provisions of the Workmen's Compensation Law, the authorities require the plaintiff seeking to recover for his injuries in an action to negative the fact that the defendant has complied with the Workmen's Compensation Law." There are no allegations that defendant failed to comply with the Workmen's Compensation Law, and the trial court, on objection by plaintiff's counsel, refused to permit defendant to ask questions regarding compliance or non-compliance with the Workmen's Compensation Law, on the ground that the defense was not pleaded, and denied defendant's motion to amend and set up the defense.

Counsel for plaintiff contends that the relationship existing between the parties when the injections were given was not that of master and servant but of hospital and paying patient, plaintiff paying for the treatment by her services as a nurse; that plaintiff's duties as nurse had ceased long before she was given treatments, and the act is not applicable. But the relation existing at the time of the alleged injury, as claimed in the complaint itself and as unquestionably established at the trial, was the relation of employer and employee. It was because of her status as a nurse employed in the hospital that she was given the medication and treatments under a duty defendant itself owed as employer by the terms of the employment contract; it is such medication and treatment that are claimed to have caused the injuries.

Plaintiff's counsel also complains that his client is being "kicked from pillar to post;" that when she filed her claim with the Comptroller within the statutory time she was not then told to apply for compensation, but was told just the opposite; that when she was examined and served her summons and complaint within the

two-year limit the defendant, failed to move to dismiss; and that on the doctrine of estoppel defendant should be barred from now alleging that the Workmen's Compensation Law applies. But estoppel is an equitable principle dependent on fraud or the assertion of an untruth or concealment of the truth. (Bispham's Principles of Equity [11th ed.], §§ 257–269, pp. 250–258.) We think that there are no facts adduced in this record to show that the principle of estoppel applies and that the trial court erroneously refused to permit inquiry to reveal the facts.

Assuming, however, without conceding, that plaintiff was a patient, we think there are other insuperable obstacles to plaintiff's recovery. A public hospital not run for profit is not liable for the negligence of its physicians and nurses in the treatment of patients if due care has been taken in their selection; no distinction is made between the position of a nurse and that of a physician and none is justified on principle. (*Schloendorff* v. *New York Hospital*, 211 N. Y. 125, 128.) That rule of exoneration has been applied even to an orderly when engaged in caring for a patient. (*Phillips* v. *Buffalo General Hospital*, 239 N. Y. 188.) In such professional acts physicians and nurses are not the agents and servants of the hospital, and the rule of *respondeat superior* does not apply. Nurses are held to be professional persons employed to exercise their calling on their own responsibility under the general direction of the physician in charge, and are grouped with physicians and surgeons and not with cooks, chambermaids, etc., employed in purely ministerial and administrative functions. (*Matter of Renouf* v. *New York Central R. R. Co.*, 254 N. Y. 349, 351.)

While the rule of *respondeat superior* does not apply in the case of doctors and nurses, it is now settled that a charitable institution is not exempt from the application of that rule in the case of injury to a patient or beneficiary occasioned by the negligence of one of the hospital's merely administrative servants or employees, such as the driver of its ambulance when functioning in that character. (*Sheehan* v. *North Country Community Hospital*, 273 N. Y. 163.) Assuming the relation as claimed by plaintiff, we think that plaintiff's own proof establishes as a matter of law that her injuries were proximately caused by the malpractice of the nurses who gave the four injections, for whose professional negligence even to a paying patient defendant, as owner of a public hospital, has no liability. (*Mills* v. *Society of New York Hospital*, 270 N. Y. 594.) Plaintiff's proof is that when the magendie solution turns brown it is obviously stale and dangerous. She testified she observed the brown color of the solution in the transparent glass hypodermic syringe at the very instant the fourth injection was being given. If visible to

her in that instantaneous glance it must have been perfectly obvious to each of the nurses who first drew the magendie from the bottle into the hypodermic syringe of transparent glass before each injection and, in spite of its obvious dark brown color, indicating to a professionally-trained nurse that it was decomposed, stale and dangerous, nevertheless deliberately injected the solution into her arm.

There is no proof that when the magendie solution was originally furnished by defendant, as the owner and operator of the hospital, it was not fresh, clear and good for the medical purposes for which it was intended. The proof was that it deteriorated and became stale and dangerous for such use by being allowed to stand. In that state of facts we think defendant was not guilty of an administrative act of negligence proximately causing plaintiff's injuries. The facts herein are not analogous to the facts in *Engels* v. *City of New York* (281 N. Y. 650), where the plaintiff was injured in a city hospital through the negligence of an elevator operator, nor to the facts in *Nathanson* v. *City of New York* (282 N. Y. 556), where the plaintiff was injured by an alleged defect in swinging glass doors. In both of those cases the plaintiffs were visitors to patients in the hospital, not patients or beneficiaries of the hospital's services, and in both cases the negligence was predicated on purely administrative functions negligently performed, viz., in the *Engels* case the operation of an elevator; in the *Nathanson* case the maintenance of glass partition doors. In this case, even assuming that the relation at the time was that of a paying patient and a public hospital, the negligence, proximately causing the injury, is that of nurses exercising purely professional functions. If there are duties performed by nurses different from their duties in carrying out the physicians' orders for the care of patients and having relation to the administrative conduct of the hospital, it was not in the discharge of such duties that defendant's nurses were serving when the injections were made. Indeed, the repeated injections, after deterioration had obviously set in, were acts of professional negligence on the part of the nurses so gross, reckless and extraordinary as to operate as an independent and superseding cause for which defendant could not be held liable. (2 Restatement, Torts, Negligence, §§ 440, 447, p. 1198, comment on clause [c], subds. e and g.)

It seems preposterous to assume that in a hospital such as Bellevue Hospital, New York, a fresh supply of this ordinary drug was not readily available and would not have been readily supplied to the nurses by the hospital in August, 1933, when it was needed for this patient. The gross negligence of those nurses who, according to plaintiff, deliberately injected the decomposed solution into

plaintiff's arm on four successive occasions was the sole proximate cause of plaintiff's injury, for which defendant has no liability.

We think, too, defendant was exercising a governmental function in supplying nurses in Bellevue Hospital for the care of the indigent poor, and, even assuming plaintiff's theory that the relation was that of hospital and patient, defendant's common-law governmental immunity precludes the present action, and such immunity has not been waived. Section 12-a* of the Court of Claims Act (added by Laws of 1929, chap. 467) abolished the common-law immunity of the State of New York, but by its express terms it is made applicable only to the State, which waived its immunity from liability for the torts of its officers and employees. That waiver does not apply to political subdivisions of the State.

Section 50-d of the General Municipal Law, which did not go into effect until 1937, four years after the present cause of action is claimed to have arisen, has no relevancy as it relates to municipal liability for malpractice of physicians and dentists gratuitously giving their services in public institutions. Municipal corporations, by the terms of that act, assume the liability of any physician or dentist rendering gratuitous services in public institutions to the extent that it saves the physician or dentist harmless for damages for personal injuries for alleged malpractice while rendering such services.

Plaintiff relies on section 1196 of the Greater New York Charter, now section 565 of the present New York City Charter, for an express waiver of tort immunity applicable to the facts in this case. That section provides, so far as relevant, that no member, officer or agent of the department of health " and no person or persons other than the department of health or the city itself shall be sued or held to liability " for any act done by either of the persons aforesaid on behalf of the health department or pursuant to its regulations, ordinances or health laws. It then provides that " any person whose property may have been unjustly or illegally destroyed or injured, pursuant to any order, regulation, or ordinance, or action of said department of health or its officers," for which no personal liability exists, may maintain an action against the city for damages, if the suit is brought within six months after the cause of action arose. The alleged negligence happened in August, 1933, and this action was begun in August, 1934. But, irrespective of any statutory limitation, we think section 1196 has no relevancy. That section, by its terms, relates to the department of health and does not refer to the department of hospitals. These two departments exercise essentially

---

* See section 8 of present Court of Claims Act.— [REP.

different functions. The department of health exercises extraordinary police powers affecting the health of the city. The department of hospitals exercises administrative powers with relation to the management of city hospitals. Statutes in derogation of immunity are strictly construed, and waiver of immunity must be clearly expressed. From the terms of that section, as well as the context in which the section appears in the charter, we think that the limited waiver of the city's immunity from liability for the acts of the officers and agents of the department of health does not include a general waiver of immunity from liability for the city's department of hospitals. The nurses' infirmary at the time in question was being used to enable the city to exercise its governmental function and not for any private proprietary enterprise or for gain or profit. It was in the service of the hospital to give nursing care to nurses employed therein so that their health would be maintained and they would thus be able to minister to the sick in the hospital and carry out its governmental function of protecting public health and public welfare. (*Nichitta* v. *City of New York*, 223 App. Div. 428; affd., 250 N. Y. 530.)

Our comment on the issue of the city's governmental immunity and the malpractice of the nurses and the failure of proof of administrative dereliction on the part of the hospital are all on the assumption of the plaintiff's theory that the relation between the parties was that of patient and hospital. As indicated above, however, we think that assumption erroneous and that the relation alleged in the complaint and clearly established at the trial was that of employer and employee.

For the reasons stated we think the judgment should be reversed, with costs, and the complaint dismissed, with costs.

GLENNON and CALLAHAN, JJ., concur; O'MALLEY and UNTERMYER, JJ., dissent and vote to affirm upon the ground that it does not appear from the complaint that the plaintiff's injuries arose " out of " as well as " in the course of " her employment (Workmen's Comp. Law, § 2, subd. 7; *Matter of Daly* v. *Bates & Roberts*, 224 N. Y. 126), and, accordingly, the defendant was required affirmatively to plead those facts in its answer if it intended to rely on the Workmen's Compensation Law. Since the plaintiff's injuries were caused by the defendant in its administrative capacity in making available for use a drug which had become decomposed and dangerous, it is liable to the plaintiff even though the nurses were also negligent in administering such a drug.

Judgment reversed, with costs, and the complaint dismissed, with costs.